UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
:
SAT Aero Holdings, Inc.,                                  :
                                                          :   Civil Action No. ___
          Plaintiff,                                      :
                                                          :
     v.                                                   :
                                                          :   **COMPLAINT**
                                                          :
Aerolinea del Estado Mexicano S.A. de                     :   **JURY TRIAL REQUESTED**
C.V.,                                                     :
                                                          :
          Defendant.                                      :
----------------------------------------------------------x

## INTRODUCTION

1. Plaintiff SAT Aero Holdings, Inc. ("SAT" or "Plaintiff") brings this lawsuit against Defendant Aerolinea del Estado Mexicano S.A. de C.V. ("Mexicana Airlines" or "Defendant") for the following: (i) breach of the ACMI Aircraft Lease Agreement dated August 18, 2023 ("ACMI Agreement"), entered into between the Plaintiff and Defendant; (ii) breach of the implied covenant of good faith and fair dealing; (iii) tortious interference with contract and business relations; and (iv) *quantum meruit*.

2. In 2023, the federal government of the United Mexican States, under the auspices of the Mexican Ministry of Defense, sought to create a new airline based in Mexico – to be called Mexicana Airlines. The airline revived the name of a brand, "Mexicana," that had previously been associated with one of the oldest airlines in the world, now defunct.

3. As the Mexican Ministry of Defense did not have experience running a commercial airline, it turned to Petrus Aero Holdings, Inc., since renamed SAT, to provide several key services for Mexicana Airlines, including, without limitation, procuring ten aircraft and insurance for them, recruiting, employing, training, and overseeing pilots and crew, and arranging for continued

1

enhancements and maintenance of the aircraft. SAT had the necessary experience, know-how, and relationships in the airline industry to effectively act as the infrastructure for Mexicana Airlines.

4. To this end, the parties entered into the ACMI Agreement, with the initials ACMI standing for Aircraft, Crew, Maintenance, and Insurance.

5. It was always understood between the parties that, while SAT would procure certain enumerated aircraft for Mexicana Airlines and provide the ongoing services, Mexicana Airlines, as backed by the Mexican government, would ultimately bear financial responsibility for the aircraft themselves. Thus, upon execution of the ACMI Agreement, Mexicana Airlines was to pay SAT over $5.5 million in deposits, so that SAT could lease the first two aircraft (of ten) for Mexicana Airlines.

6. Mexicana Airlines failed to pay this deposit upon execution of the ACMI Agreement, materially breaching the agreement. This lack of funding imperiled the parties' $800 million venture from the start.

7. Nevertheless, while reserving its rights, and based on the airline's continued promises, SAT pushed forward. SAT endeavored to do everything possible to sustain the important long-term business relationship. It continued to negotiate the lease of aircraft from leading aircraft leasing lenders in the United States on behalf of Mexicana Airlines.

8. While SAT would be the "lessee" under the terms of these financing agreements, the aircraft lender (or lessor) understandably needed some kind of commitment from the Mexican government – the deep pocket in the equation – that it was going to underwrite or guarantee the lease of the aircraft to SAT. The ACMI Agreement anticipated this, requiring the cooperation of Mexicana Airlines to execute certain documents to facilitate the procurement of the aircraft. Such an obligation is standard in similar aircraft leases.

9. Unfortunately, after SAT spent months negotiating the relevant financing and lease documents with the prospective bank and lessors, the airline balked at signing *any* documents with these institutions. This comprised the second material breach by Mexicana Airlines. Mexicana Airlines' failure to cooperate in leasing the aircraft is a further breach of the ACMI Agreement, and it has put the entire $800 million enterprise in jeopardy.

10. It gets worse. Mexicana Airlines engaged in a third material breach by poaching SAT's pilots and crews, by causing the maintenance facility SAT had contracted with to breach its contract with SAT, and by misappropriating the turn-key commercial aircraft operation that SAT had prepared for Mexicana Airlines.

11. SAT has endeavored to work with the Mexican Ministry of Defense to resolve these issues. But, instead of remedying these several breaches, Mexicana Airlines has, confoundingly, instead sought to impose financial penalties on SAT and hold it responsible for the failure to deliver any of the aircraft identified in the ACMI Agreement.

12. But, of course, SAT could not deliver the aircraft without Mexicana Airlines' contractually required deposits and cooperation in obtaining the aircraft. In any event, SAT could also not deliver the aircraft because Mexicana Airlines had not obtained, as required under the ACMI Agreement, the necessary licenses (the aircraft operating certificates ("AOC")) required for the importation of the aircraft to Mexico. This is a fourth material breach of the contract by Mexicana Airlines.

13. As a consequence of Mexicana Airlines' material breaches and its unwillingness to work with SAT on solving the problems caused by the airline's breach, SAT has been left with no choice but to bring this lawsuit against Mexicana Airlines.

14. As a result of Defendant's breaches, Plaintiff is seeking the full amount of the

contract as damages: USD$838,535,804.00.  SAT will also be seeking its out-of-pocket costs, which to date exceed US$2.4 million.

## PARTIES

15. Plaintiff SAT, formerly known as Petrus Aero Holdings, Inc., is a Texas corporation headquartered at 2030 1st Avenue, Hangar 4, San Antonia International Airport, San Antonio, Texas 78216.

16. Defendant Mexicana Airlines (Aerolinea Del Estado Mexicano, S.A. de C.V.) is a company incorporated under the laws of the United Mexican States, and it is headquartered at Ex Hacienda de Santa Lucia, Aeropuerto Internacional Felipe Angeles, Zona de Servicios Aeroportuarios, Zumpango, State of Mexico, Mexico 55640.

17. Upon information and belief, Mexicana Airlines is wholly owned by the federal government of the United Mexican States and is operated by the Mexican Ministry of Defense. Pursuant to Article 17.A.i. of the AMCI Agreement, Mexicana Airlines agreed as follows: "By executing this Agreement, [Mexicana Airlines] submits itself to the laws of New York, United States of America.  For this reason, the same, its partners and shareholders may not exercise any sovereign immunity rights regarding their properties or assets."

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 21 U.S.C. § 1332.  The amount in controversy exceeds $75,000.00 and is between a citizen of the United States and a citizen of Mexico.

19. The contract between the parties, the ACMI Agreement, provides that it should be governed by New York law and that the parties have submitted to the exclusive jurisdiction of the courts of New York.  Specifically, Article 23.A of the ACMI Agreement states the following: "The

PARTIES hereby agree that the law of New York shall be the applicable law for the purposes of this Agreement."

20. Article 23.B of the ACMI Agreement, entitled "Exclusive jurisdiction in New York," states the following: "The Parties hereby agree, to the most significant extent permitted by the applicable law, that the process before the New York courts shall be carried out in accordance with the laws of the courts of New York."

21. As set forth in paragraph 17 above, Defendant has agreed to waive and cannot exercise sovereign immunity.

## FACTUAL BACKGROUND

### A. The Initial Negotiations Between the Parties

22. SAT was introduced to Mexicana Airlines in December 2022. Around this time, the Mexican government had decided to form a new commercial airline with a hybrid team of military and commercial aviation experts. SAT, with a deep roster of aviation talent in both Mexico and the United States – including former executives of the old Mexicana Airlines – was well positioned to help the Mexican government get the airline off the ground. For example, SAT's CEO was the Chief Operations Officer for the former Mexicana Airlines and its Operations Director also spent 37 years at Mexicana Airlines. SAT's President has decades of experience overseeing aircraft purchases for the world's largest aircraft leasing companies.

23. SAT began negotiating with the Mexican government in December 2022. SAT sent its first proposal to Mexicana Airlines on January 27, 2023, and a second on February 23, 2023. On March 14, 2023, SAT sent the airline a formal written proposal listing the expected deposits and amounts that SAT would need to procure the ten aircraft.

24. In Spring 2023, SAT, being hopeful that it would ultimately win the contract from

Mexicana Airlines, began preliminary outreach in connection with the expected contract. Specifically, it began recruiting potential airline crew in May 2023 and made initial contact with the owner (ALM) of two Boeing B737-800 aircraft at the same time about delivering those aircraft to Mexicana Airlines in late 2023 or early 2024.

25. Of course, as a government contract, the Mexicana Airlines' contract had to be put out for a public bid. Mexicana Airlines used the structure initially proposed by SAT in its first proposal to the airline as the base structure for its public bid process. In other words, the airline benefitted from the knowledge and commercial insights of SAT and leveraged this to obtain competing bids.

26. SAT submitted its first proposal in response to the public bid on June 1, 2023. It submitted a second proposal on July 10, 2023. Mexicana Airlines requested additional information as part of the public bid process on July 17, 2023, and SAT responded on July 26, 2023.

27. On August 9, 2023, Mexicana Airlines gave SAT official notification that it had awarded the contract to SAT.

B. **The Terms of the ACMI Agreement**

28. SAT and Mexicana Airlines entered into the ACMI Agreement on August 18, 2023. The ACMI Agreement sets forth the terms by which SAT would lease and procure insurance for ten Boeing B737-800 aircraft to Mexicana Airlines, as well as recruit, employ, train, and oversee its pilots and crews, and arrange for continued enhancements and maintenance of the aircraft.

29. The ACMI Agreement identifies the ten aircraft and their years in service. It specifies that three of the aircraft were to be delivered in Mexico on September 30, 2023, and the other seven delivered on October 30, 2023.

30. The agreement had an 84-month term with respect to the lease, and a 24-month

term for the flight pilots and crew training and certain maintenance, which could be renewed prior to the expiration of the 24-month period.

31.     Article 3 of the agreement provides for the terms by which Mexicana Airlines were to pay SAT.  For those aircraft manufactured in 2015 or 2016, the monthly rent was to be $350,000.00.  For those aircraft manufactured in 2014, the monthly rent was to be $340,000.00.  And for those aircraft manufactured in 2013, the monthly rent was to be $330,000.00.

32.     For providing five flight crew (including pilots) per aircraft, Mexicana Airlines was to pay SAT $225,800.00 per aircraft.  The contract required Mexicana Airlines to make a monthly payment to SAT for line maintenance of $89,456.91 per aircraft and a monthly payment for non-routine service of $60,000.00 per aircraft. There were additional monthly payments for, among other things, maintenance and flight crew administration planning and a requirement that Mexicana Airlines pays over $500,000.00 per aircraft for insurance.

33.     Article 4 of the ACMI Agreement required Mexicana Airlines to pay SAT a security deposit for the lease of the ten aircraft.  Specifically, for those aircraft manufactured in 2015 or 2016, the security deposit was the equivalent of six-months' rent, or $2,100,000.00.  The security deposits for the older planes were slightly less.  Notably, the security deposits for the ten aircraft were due at the time of execution of the ACMI Agreement.

34.     In addition to the security deposits on the aircraft, Mexicana Airlines was also required to pay the following, without limitation: deposits of $100,000.00 per aircraft for maintenance reserves; $60,000.00 per aircraft for non-routine maintenance and "AOG" (aircraft-on-the-ground) support; $149,000.00 per aircraft as a security deposit on the administration and planning Services; $255,800.00 per aircraft for the flight crew; and $89,456.91 per aircraft for line maintenance.

35. Article 7 of the ACMI Agreement requires Mexicana Airlines to deliver to SAT, prior to the delivery dates, the documents necessary to import the ten aircraft into Mexico and repeats the airline's obligation to pay the first monthly fee on all the aircraft prior to their delivery.

36. Notably, Article 5.C of the ACMI Agreement states that the delivery date of the aircraft may be modified where Mexicana Airlines fails to make the respective deposit, in which event SAT would not incur any responsibility.

37. Article 5.C of the ACMI Agreement also states that the delivery dates can be modified – and SAT will not bear any responsibility – if Mexicana Airlines failed to comply with any required administrative formalities and the Mexican aviation regulations.

38. Article 10 of the ACMI Agreement sets out the training obligations of the flight crew by SAT but requires Mexicana Airlines to provide training manuals specific to its airline and the aircraft.

39. Article 12 of the ACMI Agreement sets forth the obligations of SAT for hiring and employment of the flight pilots and crew members.

40. Article 11 of the ACMI Agreement sets forth the maintenance obligations of SAT.

41. Article 21.C of the ACMI Agreement states in pertinent part as follows:

[T]he LESSOR [SAT] may, at any time and without the consent of the LESSEE [Mexicana Airlines], grant any security interest on the Aircraft and assign the benefit of this Lease to a lender (the LESSOR's Lender) as guarantee for the obligations of the LESSOR with the LESSOR's Lender. Accordingly, if the LESSOR's Lender requires any non-substantial modification to this Agreement as a condition to provide any financing, the LESSEE hereby agrees to enter into an amending agreement.

42. Article 21.D of the ACMI Agreement states in pertinent part:

At the request of the LESSOR [SAT] or the LESSOR's Lender, the LESSEE [Mexicana Airlines] shall execute all documents (such as a lease assignment agreement) that the LESSOR, the LESSOR's Assignee or the LESSOR's Lender may reasonably require to confirm the obligations of the LESSEE under the provisions of this Agreement and obtain the acknowledgment of the LESSEE that the LESSOR is not in default with this

Agreement.

43. Finally, Article 22.D of the ACMI Agreement states that the following, *inter alia*, are an "Event of Default" and a "material breach" of the ACMI Agreement by Mexican Airlines:

   a. If Mexicana Airlines "fails to pay for the ACMI Lease or any other amount due with respect to this Agreement in the manner ***and on the date provided for in this Lease Agreement***" (emphasis added).

   b. If Mexicana Airlines "fails to comply with any of its other obligations under this Lease Agreement and fails to remedy them within the twenty (20) business days following written notice to [Mexicana Airlines]."

   c. If Mexicana Airlines "does not have the certificates and permits required to develop its business as a certified air carrier in Mexico."

C. **SAT's Performance, and Mexicana Airlines' Breach, of the ACMI Agreement**

   1. **Failure to Pay the Security Deposits and Obtain the Necessary Licenses**

44. SAT had done a great deal of advance work prior to formally signing the ACMI Agreement, including signing a Maintenance Support Contact with MRO Iberoamerica on July 15, 2023.

45. In or around June 2023, SAT was introduced to Diego Velasco, a commercial director for The Boeing Company in Latin America, who began to help SAT identify Boeing aircraft that could be leased to Mexicana Airlines.

46. It had also begun communicating with potential aircraft leasing companies about acquiring the requisite aircraft, including NexBank Aviation LLC ("NexBank"), a Dallas-based bank. When it signed the ACMI Agreement, therefore, SAT hit the ground running.

47. By way of example only, on September 3, 2023, as part of its prospective leasing

9

arrangement with SAT, NexBank sent a comfort letter to the owner of two B737-800 aircraft that NexBank intended to buy in anticipation of leasing them to SAT and Mexicana Airlines. Between September and December 2023, both SAT and its potential leasing companies had numerous communications with various aircraft owners about purchasing planes in anticipation of Mexicana Airlines providing the funds for such purchase and otherwise underwriting the lease.

48. SAT performed its other obligations as well. It entered into an agreement with a training facility. On October 11, 2023, SAT hosted a mass recruitment event for prospective flight crew for Mexicana Airlines. Between October 2023 and January 2024, SAT oversaw the training of multiples cohorts of flight crew and pilots to be utilized by Mexicana Airlines.

49. Unfortunately, Mexicana Airlines did not adhere to its own contractual obligations. Most fundamentally, Mexicana Airlines failed to make the security deposit payment upon execution of the agreement, thus making it impossible for SAT to enter into agreements with leasing companies and deliver the planes as expected. SAT invoiced Mexicana Airlines for the security deposits on September 22, 2023, and still they were not paid.

50. Mexicana Airlines also failed to obtain the necessary licenses (AOCs) required to fly the aircraft commercially in Mexico, thus further delaying delivery, even if the security deposits had been paid in a timely manner (which they were not).

51. As set forth above, these are both material breaches as defined in the ACMI Agreement.

52. As a result of the failures of Mexicana Airlines to pay the security deposits as and when required, SAT was unable to secure the initial aircraft by their delivery dates. Despite being in breach of the contract and being the cause of the failure to procure the planes, Mexicana Airlines has improperly imposed financial penalties on SAT for the late delivery – *a failure to deliver that*

*is in no way SAT's fault and was indeed Mexicana Airlines' fault*.

   2.  **Mexicana Airlines Breaches the ACMI Agreement By Failing to Cooperate in the Leasing of the Aircraft**

   53.   As envisioned by the AMCI Agreement, SAT went out into the market to lease the aircraft with, among others, NexBank.

   54.   NexBank entered into a Term Sheet with SAT to lease the first two aircraft – as a starting point – but understandably required a financial guarantee from Mexicana Airlines. Mexicana Airlines refused to provide it or otherwise do anything to facilitate the leasing of the aircraft, in contravention of Article 21 of the AMCI Agreement.

   55.   On October 4, 2023, SAT wrote to Mexicana Airlines demanding payment of the security deposits and that the airlines sign the guaranty.

   56.   In or around October 5, 2023, Mexicana Airlines announced a public bid for the exact type of aircraft that it had contracted with SAT to acquire and lease to it, an act of bad faith that inflated the prices of such aircraft by increasing demand prior to SAT's purchase, which aimed to frustrate SAT's performance of the AMCI Agreement.

   57.   Representatives of the Mexican Ministry of Defense and Mexicana Airlines repeatedly reassured SAT that the security deposit payments would be forthcoming.  For example, on October 8, 2023, representatives of SAT were told by representatives of the Mexican Ministry of Defense that they had given the order for Mexicana Airlines to pay the security deposits.  In reliance on these repeated promises, SAT kept performing under the AMCI Agreement.  But still, the security deposits remained unpaid.

   58.   On November 8, 2023, SAT wrote to Mexicana Airlines, notifying it of Mexicana Airlines' failure to perform under the ACMI Agreement by failing to provide the necessary licensing documents to procure the aircraft, once again demanding cooperation with the leasing

documents and notifying it of Mexicana Airline's failure to provide other necessary documents required under the parties' agreement.

59. On November 6, 2023, SAT wrote to Mexicana Airlines updating it on the aircraft and the pilots and crew and proposing new delivery dates for the aircraft. A week later, a lawyer for SAT wrote to the airline asking for updates on the deposit payments.

60. On November 17, 2023, Mexicana Airlines wrote to SAT to assure it that Mexicana Airlines had the financial backing of the Mexican government to make the required deposit payments, but Mexicana Airlines notified SAT that such payments were suspended due to the year-end budget process and would resume once the Mexican payment system was reactivated.

61. Around this time, representatives of SAT were told that Mexicana Airlines officials had been reaching out directly to the pilots, crew, and flight attendants employed by SAT, telling them falsely that the airline no longer had a relationship with SAT.

62. On November 23, 2023, representatives of SAT notified Mexicana Airlines that Mexicana Airlines was in breach of the contract for failure to pay the required deposits and putting it on notice of its attempts to poach SAT employees in contravention of the ACMI Agreement.

63. Despite its clear breach of the ACMI Agreement and its continued reassurance to SAT about the forthcoming payment of the security deposits, around this time, Mexicana Airlines began to assert that SAT was in breach of the AMCI Agreement for failing to deliver the planes – *despite the fact that Mexicana Airlines continually cut the financial legs out from under SAT and its own actions prevented SAT from delivering the planes*.

64. To this end, on or around November 27, 2023, representatives of the Mexican Ministry of Defense, working on behalf of Mexicana Airlines, coerced SAT to enter into an amendment to the AMCI Agreement. Representatives of SAT were invited to a meeting with a

group of Generals from the Mexican Ministry of Defense and were threatened that SAT must accept the financial penalty for late delivery of the aircraft. SAT signed the amendment accordingly, but under duress—indeed, even under fear. The amendment was backdated to the original date of the contract, August 18, 2023.

65. Mexicana Airlines finally paid the security deposits for the first two aircraft in or around December 2, 2023, which SAT paid to NexBank. Nevertheless, Mexicana Airlines continued to undermine its relationship with SAT in breach of the ACMI Agreement. Because it would not sign as a guarantor to the leasing of the planes, SAT restructured the relationship with NexBank, such that the parties would enter into a three-way agreement, pursuant to which Mexicana Airlines would be jointly and severally liable for the financial obligations to NexBank. Mexicana Airlines initially confirmed that it was willing to proceed on such terms and promised to sign the contract. But at the last minute, Mexicana Airlines refused to sign this agreement as well. This was effectively the nail in the coffin for the AMCI Agreement.

66. SAT remains unable to arrange for leasing of the aircraft, as a result of Mexicana Airlines' breach. More than one potential supplier of the aircraft has walked away from negotiations with SAT and NexBank, as a result of Mexicana Airlines' intransigence, with one of the potential leasing companies having communicated – after months of negotiation — that it had found an "easier client" for their aircraft. Mexicana Airlines has frustrated the entire purpose of the AMCI Agreement.

3. **Mexicana Airlines' Tortious Interference**

67. In the meantime, Mexican Airlines took other steps to breach the AMCI Agreement and undermine SAT.

68. First, on November 20, 2023, Mexicana Airlines directly contacted SAT's flight

13

training facility, Orion, to arrange for flight attendant training, in contravention of the AMCI Agreement and tortiously interfering with SAT's contract with Orion.

69.     Similarly, in December 2023, Mexicana Airlines entered into a maintenance contract with MRO Iberoamerica for maintenance of one of its planes provided by the Mexican air force, also tortiously interfering with SAT's relationship with that entity.

70.     In January 2024, SAT had invited numerous pilots, crew, and flight attendants who had completed the SAT training, pursuant to temporary contracts, to come to SAT's offices to sign their full-time employment contracts.  Mexicana Airlines contacted many of these employees directly, falsely informing them that SAT was no longer involved with the training of employees for Mexicana Airlines and inducing these employees instead to sign contracts with Mexicana Airlines.  At least 19 employees trained by SAT and ready to be hired by SAT, in order to be contracted out to Mexicana Airlines, were instead directly hired by Mexicana Airlines.

71.     Mexicana Airlines, which had no background in commercial airline operation, has effectively misappropriated the turn-key airline operation that SAT has built for them—*a turn-key airline operation that Mexicana Airlines bargained for and agreed to receive from SAT, for which Mexicana Airlines was supposed to provide consideration to SAT*.

72.     In summary, Mexicana Airlines failed to do the following, without limitation: (i) timely provide the security deposits; (ii) cooperate by signing necessary documents in connection with the leasing of the aircraft; and (iii) obtain the necessary licenses (AOCs) to operate the aircraft in Mexico.  And Mexicana Airlines poached the flight pilots and crews, interfered with SAT's agreements with its maintenance facility, its training center and others, and misappropriated SAT's know-how.  Mexicana Airlines has breached the AMCI Agreement, the parties are not able to move forward with the agreement, and SAT is hereby forced to seek the assistance of this Court

for the financial loss that it has suffered.

73. Plaintiff has been damaged in the amount of the AMCI Agreement: USD$838,535,804.00. SAT will also be seeking its out-of-pocket costs, which to date exceed US$2.4 million, including costs related to the pilot and flight attendant training and their uniforms, aircraft inspections, aircraft maintenance software, and others related expenses.

## FIRST CLAIM FOR RELIEF

### Breach of Contract Against Defendant

74. Plaintiff repeats and realleges the allegations in paragraphs 1 through paragraph 73, as if set forth herein.

75. Plaintiff and Defendant entered into the AMCI Agreement on August 18, 2023.

76. Plaintiff performed its obligations under the agreement.

77. Defendant has breached the agreement by failing to pay the security deposits in the contractually required time, thus preventing SAT from being able to procure the aircraft.

78. Defendant is in further breach of the AMCI Agreement by failing to cooperate with signing the necessary leasing documents.

79. Defendant is in further breach of the AMCI Agreement by arbitrarily imposing financial penalties on Plaintiff for the late delivery of the aircraft, when such failure to deliver the aircrafts was entirely caused by Defendant's breaches.

80. Defendant is in further breach of the AMCI Agreement by failing to obtain the necessary licenses (AOCs) to operate the aircraft in Mexico.

81. Defendant is in further breach of the AMCI Agreement by directly hiring pilots and crew who were trained by SAT, to be employed by SAT, and to be contracted out to Mexicana Airlines.

82. As set forth in the AMCI Agreement, these breaches are material.

83. As a result of Defendant's breaches, Plaintiff has been damaged at an amount to be determined at trial, but no less than the amount of the contract, $838,535,804.00, as well as its out-of-pocket costs.

## SECOND CLAIM FOR RELIEF

**Breach of the Implied Covenant of Good Faith and Fair Dealing Against Defendant**

84. Plaintiff repeats and realleges the allegations in the preceding paragraphs 1 through 73, as if fully set forth herein.

85. The AMCI Agreement, being governed by New York law, contains an implied covenant of good faith and fair dealing.

86. Plaintiff performed its obligations under the agreement.

87. Defendant breached the implied covenant of good faith and fair dealing by putting out a public bid for the aircraft that it had previously contracted with SAT to obtain.

88. It further breached the implied covenant of good faith and fair dealing by not negotiating in good faith the necessary leasing documents with SAT's lender and, to the extent not expressly required by the AMCI Agreement, by not signing the necessary documents to facilitate the leasing of the aircrafts.

89. It further breached the implied covenant of good faith and fair dealing by falsely informing SAT employees (the flight crews) that SAT was no longer involved with training prospective flight crews for Mexicana Airlines.

90. As a result of Defendant's breaches, Plaintiff has been damaged at an amount to be determined at trial, but no less than the amount of the contract, $838,535,804.00, as well as its out-of-pocket costs.

## THIRD CLAIM FOR RELIEF

**Tortious Interference with Contract/Business Relationship Against Defendant**

91.     Plaintiff repeats and realleges the allegations in the paragraphs 1 through 73, as if fully set forth herein.

92.     Plaintiff had entered into temporary contracts with certain pilots and flight crew members during their training, with the understanding that they would enter into full-time contracts, upon completion of the training.

93.     Defendant was aware of these contractual relationships.  But Defendant wrongfully told these employees that Mexicana Airlines no longer had a relationship with SAT and induced these employees — who had already benefitted from SAT's training – to contract directly with Mexicana Airlines instead.

94.     Similarly, Defendant induced the maintenance facility hired by SAT, MRO Iberoamerica, to terminate its contract with SAT and enter into a contract directly with Defendant instead.

95.     Defendant also contracted with Plaintiff's training facility, Orion, directly for the training of its flight crews, thereby tortiously interfering with Plaintiff's relationship.

96.     As a result of Defendant's tortious interference, Plaintiff has suffered damage.

## FOURTH CLAIM FOR RELIEF

Quantum Meruit Against Defendant

97.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 73, as if fully set forth herein.

98.     Plaintiff trained pilots and crew on behalf of Defendant.

99.     Defendant has hired these pilots and crew, without compensation to Plaintiff.

100. Defendant has also misappropriated other intellectual property, trade secrets, and know-how related to the operation of an airline, without compensation to Plaintiff, including, without limitation, its maintenance facility and its training center. In effect, Defendant has misappropriated all of the work that Plaintiff has done to create the infrastructure for a commercial airline, without compensation to Plaintiff.

101. Plaintiff has been damaged as a result of Defendant's violations and deserves to be compensated for these services that it provided to Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. On the First and Second Claim for Relief, awarding Plaintiff $838,535,804.00, plus its out-of-pocket costs, as compensatory damages against Defendant;

B. On the Third and Fourth Claims for Relief, awarding Plaintiff compensatory damages in an amount to be determined at trial;

C. Pre-judgment interest at the statutory rate of 9% per annum as of the date of Defendant's first breach and interest on the judgment at the highest legal rate thereafter;

D. Costs and attorneys' fees, as provided for in Article 23.C of the ACMI Agreement; and

E. All other further and equitable relief the Court may deem just and proper.

Dated: New York, New York
March 27, 2024

Respectfully submitted,

**BAILEY DUQUETTE P.C.**

/s/ James D. Bailey

James D. Bailey
104 Charlton St., Ste. 1W
New York, NY 10014
Tel: (212) 658-1946
Fax: (866) 233-5869
james@baileyduquette.com

**NEMATZADEH PLLC**

Justin Nematzadeh
101 Avenue of the Americas, Suite 909
New York, NY 10013
jsn@nematlawyers.com

*Attorneys for Plaintiff SAT Aero Holdings, Inc.*

*Of Counsel*:

Germán Morales
Bailey Duquette P.C.
1700 E. Las Olas Blvd., Suite 207
Fort Lauderdale, FL 33301
german@baileyduquette.com